UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x
                             :
In re:                               :   Chapter 11
                             :
JEWELED OBJECTS LLC,          :   Case No. 10-11831 (RDD)
                             :
             Debtor             :
---------------------------------------------------------- x
                             :
JOEL BOYARSKY, ACCOUNTANTS     :
PROPRIETARY FINANCIAL SERVICENET,  :
INC., THE PAMELA B. BLATTNER LIVING  :
TRUST, LBV RETIREMENT PLAN,      :
ARNOLD WOLOWITZ, CAROL WOLOWITZ,  :
AND THE CAROL WOLOWITZ AND ARNOLD :
WOLOWITZ FOUNDATION, INC,       :
individually and on behalf of      :
JEWELED OBJECTS LLC,          :
                             :
                             :
           Plaintiffs,         :
                             :
    - against-              :   Adv. Pro. No. 10-03198 (RDD)
                             :
ROBERT HOBERMAN, MITCHEL MAY, HGL  :
MANAGEMENT LLC, RALPH ESMERIAN,   :
R. ESMERIAN, INC., FINE JEWELS     :
ASSOCIATES, PRECIOUS STONES      :
COMPANY, BENJAMIN ZUCKER, and     :
BECKMAN, LIEBERMAN & BARANDES LLP  :
                             :
                             :
           Defendants.        :
----------------------------------------------------------x

## MEMORANDUM OF DECISION ON
## BECKMAN, LIEBERMAN & BARANDES LLP'S
## <u>MOTION TO DISMISS</u>

Appearances:  Pryor Cashman, LLP by Jamie M. Brickell, Esq., for Joel Boyarsky, Accountants
                 Proprietary Financial Servicenet, Inc., the Pamela B. Blattner Living Trust, LBV
                 Retirement Plan, Arnold Wolowitz, Carol Wolowitz, and the Carol Wolowitz and
                 Arnold Wolowitz Foundation, Inc., individually and on behalf of debtor
                 Jeweled Objects LLC

Paul Batista, P.C. by Paul A. Batista, Esq. for Beckman, Lieberman & Barandes, LLP

Hon. Robert D. Drain, United States Bankruptcy Judge:

In the complaint, dated March 2, 2010 (the "Complaint") in this adversary proceeding, plaintiffs Joel Boyarsky ("Boyarsky"), Accountants Proprietary Financial Servicenet, Inc., the Pamela B. Blattner Living Trust, LBV Retirement Plan, Arnold Wolowitz, Carol Wolowitz, and the Carol Wolowitz and Arnold Wolowitz Foundation, Inc., acting not only on their own behalf (in such capacity, the "Boyarsky Parties") but also on behalf of the reorganized debtor, plaintiff Jeweled Objects LLC ("Jeweled Objects," and with the Boyarsky Parties, the "Plaintiffs"), as previously consented to by Jeweled Objects and permitted by the Court, assert claims arising from an alleged wrongful and fraudulent scheme to cause the Boyarsky Parties to invest in Jeweled Objects and to cause Jeweled Objects not to receive the benefit of agreements to obtain an interest in valuable jewels and antiquities.

This memorandum of decision sets forth the basis for the Court's ruling on the motion of one of the defendants, Beckman, Lieberman, & Barandes LLP ("Beckman"), to dismiss the Complaint's causes of action against it pursuant to Fed. R. Bankr. P. 7009 and 7012, incorporating Fed. R. Civ. P. 9(b) and 12(b)(6). As set forth in the Complaint, Beckman served in at least two instances as counsel to certain of the other defendants and Jeweled Objects on transactions at issue.

For the reasons set forth below, all of the causes of action in the Complaint against Beckman are dismissed, without prejudice to the Plaintiffs' right make a motion under Fed. R. Bankr. P. 7015 for leave to amend the Complaint within 30 days.

## Jurisdiction

This proceeding was removed from the Supreme Court of the State of New York, County of New York to the District Court and then remanded to this Court.

This Court has jurisdiction over this proceeding under 28 U.S.C. §§ 157(a) and 1334(b), the Amended Standing Order of Reference, M10-468, dated January 31, 2012 (Preska, C.D.J.), and ¶ 11 of this Court's Order, dated April 2, 2012, confirming the Debtor's chapter 11 plan. This is not a core proceeding under 28 U.S.C. § 157(b).

On Jeweled Objects' consent, the Court had previously granted standing to the Boyarsky Parties to assert Jeweled Objects' claims in this proceeding, Commodore Int'l v. Gould (In re Commodore Int'l Ltd.), 262 F.3d 96, 100-101 (2d Cir. 2001), which at this time (Jeweled Objects' other claims having been settled), are only against Beckman.  The allocation of any proceeds obtained in this proceeding from Beckman between the Boyarsky Parties in respect of their individual claims and Jeweled Objects' chapter 11 estate has been reserved for later determination, if necessary.  See Second Amended Disclosure Statement, dated January 5, 2012, at 7 and 17-18.

## Facts

For purposes of Beckman's motion to dismiss, the Court accepts the Complaint's factual allegations as true and draws all reasonable inferences in the Plaintiffs' favor.  LaFaro v. New York Cardiothoracic Grp., 570 F.3d 471, 475 (2d Cir. 2009).

The Complaint alleges that Jeweled Objects, a newly formed New York limited liability company, purchased thirty-eight purportedly valuable jewels and antiquities (the "Jewels") for $8.95 million from defendant R. Esmerian, Inc. ("REI"), a corporation controlled by defendant

Ralph Esmerian ("Esmerian"), pursuant to a Jewelry Purchase Agreement (the "JPA") dated March 27, 2006 and executed in May 2006.  Complaint ¶¶ 71-73.

At the same time, Jeweled Objects agreed pursuant to a Deferred Jewelry Purchase Agreement (the "Deferred Purchase Agreement") to sell the Jewels for $8.95 million plus a 21% "Deferred Acquisition Payment" ($1,879,500) to defendant Fine Jewels Associates ("Fine Jewels") with a closing date of March 27, 2007.  Id. ¶ 90.  Esmerian and REI owned Fine Jewels, and they each agreed to be jointly and severally liable for Fine Jewels' obligations under the Deferred Purchase Agreement.  Id. ¶¶ 32, 91-92.  Under the Deferred Purchase Agreement, if Fine Jewels did not purchase the Jewels by the deadline, Jeweled Objects could "immediately sell all or any part of the [Jewels]" and retain up to the purchase price under the Deferred Purchase Agreement plus liquidated damages of 20%, while any remaining sale proceeds would be delivered to Fine Jewels.  Id. ¶ 93.

The Boyarsky Parties acquired membership interests in Jeweled Objects in April 2006 for the aggregate sum of $5.25 million.  Id. ¶¶ 39-45, 72.

Mitchell May ("May") and Robert Hoberman ("Hoberman") through Hoberman's "shell company," defendant HGL, id. ¶ 29, were the other investors in Jeweled Objects.  See Chapter 11 Petition of Jeweled Objects, dated April 17, 2010, listing Jeweled Objects' interest holders; Complaint ¶ 47. HGL and May also were Jeweled Objects' managers. Complaint ¶¶ 19, 46. Hoberman (an accountant and financial advisor) and May (a lawyer) were also Esmerian's long-time business advisors, id. ¶¶ 3, 48, 49, 52, 53, with May maintaining his office in Esmerian's office since at least early 2006.  Id. ¶ 54.  On behalf of Esmerian, both men had helped to arrange the financing by Merrill Lynch of REI's purchase of a large jeweler, Fred Leighton Jewelers, which was guaranteed by Esmerian; they therefore had a close knowledge of REI's and Fred

4

Leighton Jeweler's books and records, assets and liabilities and knew that almost immediately after the closing of the Fred Leighton Jewelers transaction Esmerian and REI would need additional cash to service the Merrill Lynch debt. Id. ¶¶ 55-58. The ostensible purpose of the Jeweled Objects transaction, including obtaining the Boyarsky Parties' investments in Jeweled Objects, was to raise some of that cash, id. ¶ 2-4, 59-62, 96, albeit at an extremely attractive rate of return for Jeweled Objects and its investors. Presumably, once Esmerian and REI's cash position had stabilized, they would be able to repurchase the Jewels through Fine Jewels.

Fine Jewels did not purchase the Jewels back as provided in the Deferred Purchase Agreement, however. Id. ¶ 99. Instead, Jeweled Objects, through May and HGL, agreed in Amendment #1 to the Deferred Purchase Agreement to extend the deadline for the purchase another year, to March 27, 2008, in return for Fine Jewels' agreement to make an additional $1,879,500 "Deferred Acquisition Payment" to Jeweled Objects and the pledge of a valuable diamond and emerald necklace as collateral. Id. ¶¶ 101-103.

Fine Jewels also did not purchase the Jewels on March 27, 2008. Instead, the parties entered into Amendment #2 to the Deferred Purchase Agreement, which extended Fine Jewels' purchase deadline to December 31, 2009, deemed the initial purchase price increased to $10,740,000, and provided for interest through December 31, 2009 aggregating $2,657,200. Id. ¶¶ 107-108, 110-111. At the same time, Esmerian and REI agreed to guarantee Fine Jewels' obligations under the Deferred Purchase Agreement, as amended, and to provide additional valuable collateral therefor. Id. ¶¶ 112-113.

Fine Jewels defaulted by not making all of its payments under the Deferred Purchase Agreement, as amended. Id. ¶ 119. When the Complaint was filed, Jeweled Objects had not successfully exercised its rights in the additional collateral, however, allegedly because May and

HGL never reasonably acted to seize it on Jeweled Objects' behalf, id. ¶ 120-121, and did not aggressively prosecute Jeweled Objects' lawsuit to enforce its rights.  Id. ¶ 123.

Beckman was counsel to both Jeweled Objects and REI in negotiating the JPA, id. ¶ 74, represented both Jeweled Objects and Fine Jewels in negotiating and drafting the Deferred Purchase Agreement, id. ¶ 95, and may have represented Jeweled Objects in drafting Amendment #1 to the Deferred Purchase Agreement.  Id. ¶ 101 (it is clear from this paragraph that Beckman worked on Amendment #1, but not for whom).  Beckman also agreed to act as escrow agent for UCC documentation concerning the release of the additional collateral pledged to Jeweled Objects in connection with Amendment #2 to the Deferred Purchase Agreement, in the event of Fine Jewels' default.  Id. ¶¶ 112-117.

The Complaint asserts four frauds or instances of wrongdoing related to the foregoing facts, none of which, however -- except as asserted in paragraphs that lump the defendants together in a conclusory way or that are premised merely on Beckman's functioning as a lawyer on a transaction, see id. ¶¶ 1, 2, 4, 5, 6, 17, 61, 68, 96-97, 100-101, 106 -- even remotely involve Beckman.

**Fraud 1, as to the value of the Jewels.**  Hoberman "represented to Plaintiffs, as a central tenet of his and May's investment proposal, that a portion of the [Jewels] had already been appraised by a reputable appraiser and that the appraisal of that subset of the [Jewels] was at least three times the amount of Jeweled Objects' purchase price. Thus Hoberman and May represented to Plaintiffs that if Esmerian/REI failed to repurchase the [Jewels] within one year . . . . Jeweled Objects would have more than ample security to recoup its investment plus a significant profit."  Id. ¶ 63.  See also id. ¶ 82, stating that "Hoberman represented to Plaintiffs (through Boyarsky) that the remaining 18 [Jewels] were valued at $4,765,000."

6

Hoberman's representations about the Jewels' value were knowingly false when made, were intended to be relied upon by Plaintiffs and were relied upon to their detriment.  Id. ¶ 64; see also id. ¶¶ 85-87.

It is not alleged that Hoberman or May were acting as agents with apparent authority for any of the other defendants, including Esmerian, REI, and Fine Jewels, when making these misrepresentations. See id. ¶ 50, 62, 82-83.  Indeed, on the face of the JPA and the Deferred Purchase Agreement, as well as structurally as managers and part owners of Jeweled Objects, Hoberman, HGL and May were acting for Jeweled Objects, not Esmerian, REI or Fine Jewels.

Nor is it alleged that any of the other defendants, including Beckman, even knew that Hoberman and May were making such misrepresentations.

Another misrepresentation as to the Jewels' value also is alleged: in the JPA, REI represented and warranted to Jeweled Objects that the Jewels "have an appraised value of at least three times the Purchase Price."  Id. at ¶ 79.  This representation and warranty also was knowingly false when made, as it was based on a 2006 appraisal by Defendant Benjamin Zucker, through his company, defendant Precious Stones, that was not reasonable, genuine and objective but, rather, was based on a highly subjective methodology relying on unsubstantiated "astronomical premiums."  Id. ¶¶ 80, 85-87.

It is not alleged, however, that REI's misrepresentation in the JPA was made to any of the Boyarsky Parties or with the knowledge that the Boyarsky Parties would rely on it.  In fact, it is not alleged that the Boyarsky parties ever read or even asked to see Zucker's appraisal.

Moreover, it is not alleged that Beckman (as opposed to all of the other defendants) had any knowledge of the falsity of Zucker's appraisal or, therefore, the falsity of REI's representation and warranty of the appraised value of the Jewels.  Id. ¶¶ 84, 86-89.

7

The Complaint also alleges that, in connection with Amendment #1 to the Deferred Purchase Agreement, Zucker reaffirmed his appraisal, representing to someone (although apparently not to any of the Plaintiffs) that the twenty appraised Jewels "are of equal or greater value today." Id. ¶¶ 104-106.   The Complaint also alleges that "[w]ith the knowledge and encouragement of each of the other Defendants, Hoberman then deceptively advised Boyarsky (and through him the other Plaintiffs) . . . that Jeweled Objects had obtained Zucker's and Precious Stones' reaffirmed 'fair market value' appraisal." Id. ¶ 106.   However, if the reference to "the other Defendants" in the foregoing quotation was meant to include Beckman, it is wholly conclusory, because, as noted, the Complaint nowhere asserts that Beckman ever knew of the falsity of Zucker's appraisal or of the "reaffirmed appraisal."

**Fraud 2, as to the Jewels being free and clear of liens.**  The Complaint also alleges that REI represented and warranted in the JPA that the Jewels were "owned by [REI] free and clear of any liens, encumbrances or restrictions" and that "no consent, authorization or approval of any third party . . . [was] required for . . . the consummation by [REI]" of the contemplated transaction. Id. ¶ 75, 77.  These representations by REI were false, because at least six of the 38 Jewels had been pledged as collateral to Merrill Lynch for the Fred Leighton Jewels acquisition financing. Id. ¶¶ 10, 65-66.

Unlike the other frauds described in the Complaint, it is at least alleged that Beckman knew of the falsity of REI's representations.  In fact, it is alleged several times. Id. ¶¶ 9, 65-66, 76, 78.  However, no basis for this allegation is provided with the exception of the statement that Beckman represented both Jeweled Objects and REI in connection with the JPA; therefore, it is hard to see the allegation as anything more than merely conclusory. Beckman's dual representation did not include, apparently, the provision of an opinion with respect to REI's

transfer of the Jewels to Jeweled Objects free and clear of liens, because no such opinion is

alleged.  Nor is it alleged that Beckman investigated REI's title in the Jewels or was informed by

Esmerian or anyone else that some of the Jewels were already encumbered.  Nor are any other

facts alleged that would lead to the strong inference that Beckman knew that REI had already

pledged any Jewels.  In contrast to the allegations concerning Hoberman and May, for example,

it is not alleged that Beckman had acquired a close knowledge of REI's books and records, assets

and liabilities such that Beckman would have known that some Jewels already had been pledged

to Merrill Lynch.

Similar to the misrepresentations of the Jewels' value to the Plaintiffs, there also is no

allegation that Beckman itself ever represented to any Plaintiff that REI owned the Jewels free

and clear, and in fact one must truly stretch in Plaintiffs' favor to find any allegation of any

representation by any of the Defendants to any of the Boyarsky Parties that Jeweled Objects

would own all of the Jewels free and clear.  At best, it can be inferred that Hoberman and

perhaps May made such a representation to Boyarsky, id. ¶¶ 62-64, 67, although those

paragraphs do not actually refer to such a representation except to the extent that one might infer

that it was an unspoken component of the misrepresentation that Jeweled Objects would have

more than ample security to recoup its investment plus a significant profit.[1]   Also, as with the

misrepresentations of the Jewels' value, the Complaint does not allege either that Beckman knew

that Hoberman and May were acting as agents with apparent authority for REI, Esmerian and

Fine Jewels when making such misrepresentations, if they can be said to have made them, or that

Beckman knew that Hoberman and May were making such representations to the Plaintiffs.  Nor

---

[1] See also id. ¶ 9, which states that "among their deceptions, Hoberman, May and Esmerian, in conspiracy with
Defendant Beckman, intentionally deceived Plaintiffs into believing that all of the 38 [Jewels] were free and clear of
liens and encumbrances."  No specific time when this misrepresentation occurred is given, however, or a description
of what was said by whom, with the exception of REI's representation and warranty in the JPA and the
representations of Hoberman and May described in ¶¶ 62-64 and 67 of the Complaint.

is it alleged that any of the Boyarsky Parties were third party beneficiaries of the JPA or that they even read it.

**Fraud 3, as to Esmerian's sale of one of the Jewels.**  The Complaint alleges that Esmerian sold one of the Jewels, a ring, and never remitted any of the proceeds to Jeweled Objects.  Id. ¶ 13.  It is not contended, however, that Beckman knew of this sale.  Moreover, although there is some suggestion that the structure of the JPA and the Deferred Purchase Agreement facilitated such a fraud (because the Jewels were left in Esmerian's possession without effective monitoring), id. ¶¶ 11, 12, it is not alleged that anyone ever represented that Jeweled Objects, as opposed to REI or Esmerian, would retain physical possession of the Jewels, and such retention appears to be inconsistent with the Deferred Purchase Agreement. See id. ¶ 11:  "Hoberman, May, and Esmerian further intentionally deceived Plaintiffs into believing that the [Jewels] would be kept in secure bailment for Jeweled Objects' benefit."  Nor is it alleged how, if at all, Beckman was responsible for the ineffective protection of the Jewels in Esmerian's possession.

**Fraud 4, as to the enforcement of Jeweled Objects' rights under the Deferred Purchase Agreement, as amended, and to the additional collateral.**  Finally, it is alleged that the defendants, including Beckman, conspired to prevent Jeweled Objects from enforcing its rights against Esmerian, REI and Fine Jewels when Fine Jewels did not buy back the Jewels, including by "orchestrating" the extensions of the Fine Jewels' purchase deadline under the Deferred Purchase Agreement, id. ¶¶ 14, 100; by preventing Jeweled Objects, after Fine Jewels defaulted, from obtaining the additional collateral pledged in connection with Addendum #2 to the Deferred Purchase Agreement, id. ¶¶ 15-16, 98, 122; and by causing Jeweled Objects not to aggressively pursue an enforcement lawsuit.  Id. ¶¶ 18, 123.

10

What are the alleged facts, however, regarding Beckman's role in the foregoing misconduct?  Only (a) that Beckman represented one or both parties in entering into Amendment #1 to the Deferred Purchase Agreement, which Jeweled Objects undertook apparently with the Boyarsky Parties' tacit agreement for substantial additional consideration, the falsity or illusory nature of which is not alleged to have been known by Beckman, and (b) that Beckman served as UCC escrow agent with respect to the additional collateral pledged at the time of Amendment #2 to the Deferred Purchase Agreement.  It is not alleged that Beckman represented Jeweled Objects or any other party in connection with Fine Jewels' default, that Beckman breached its escrow agreement, or that Beckman represented Jeweled Objects in the state court enforcement litigation.

The only consideration Beckman received for its alleged wrongdoing was the legal fees it charged.  Id. ¶ 70.

Based on the foregoing facts, the Complaint asserts claims that Beckman conspired to commit fraud and fraudulent inducement, in connection with Hoberman and May's alleged frauds regarding the Jewels' value and all Jewels being free and clear of liens; conspired to commit breach of fiduciary duty, in connection with HGL and May's alleged breaches of fiduciary duty related to the foregoing and Jeweled Objects' ineffective assertion of remedies; and converted the Plaintiffs' property.  The Complaint does not assert a direct claim against Beckman for breach of fiduciary duty or legal malpractice.

### Standard for Dismissal under Rule 12(b)(6)

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), incorporated by Fed. R. Bankr. P. 7012, the Court must assess the legal feasibility of the complaint, not weigh the evidence that might be offered in its support.  Koppel v. 4987 Corp., 167 F.3d 125, 133 (2d Cir.

1999).  The Court's consideration "is limited to facts stated on the face of the complaint and in documents appended to the complaint or incorporated in the complaint by reference, as well as to matters of which judicial notice may be taken."  Hertz Corp. v. City of New York, 1 F.3d 121, 125 (2d Cir. 1993), cert. denied, 510 U.S. 1111 (1994); see also DiFolco v. MSNBC Cable LLC, 622 F.3d 104, 111 (2d Cir. 2010) ("Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect….").

The Court accepts the complaint's factual allegations as true, even if they are doubtful in fact, and must draw all reasonable inferences in favor of the plaintiff, Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 321-23 (2007); however, if a complaint's allegations are clearly contradicted by documents incorporated into the pleadings by reference, the Court need not accept them.  Labajo v. Best Buy Stores, L.P., 478 F. Supp. 2d 523, 528 (S.D.N.Y. 2007).

Moreover, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation."  Papasan v. Allain, 478 U.S. 265, 286 (1986).  Instead, the complaint must state more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).

In addition, while the Supreme Court has confirmed, in light of the notice-pleading standard of Fed. R. Civ. P. 8(a), that a complaint does not need detailed factual allegations to survive a motion under Rule 12(b)(6), Erickson v. Pardus, 551 U.S. 89, 93 (2007); Twombly, 550 U.S. at 555,[2] its "[f]actual allegations must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.  If the claim would not otherwise be plausible on its face, therefore, the complaint must allege sufficient facts to "nudge [the] claim across the line from conceivable to plausible," id. at 570; otherwise, the defendant should not be subjected to

---

[2] Nor does Rule 8(a) require a claimant to state any legal theory justifying the relief sought on the facts alleged, requiring only sufficient factual reference to show that the claimant may be entitled to some form of relief.  Newman v. Silver, 713 F.2d 14, 15 (2d Cir. 1983); Tolle v. Carroll Touch Inc., 977 F.2d 1129, 1134 (7th Cir. 1992).

the burdens of continued discovery and the worry of overhanging litigation. <u>Id.</u> at 556.  Applying this plausibility standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679 (2009). "Plausibility thus depends on a host of considerations:  the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable."  <u>L-7 Designs, Inc. v. Old Navy, LLC</u>, 647 F.3d 419, 430 (2d Cir. 2011).

In sum, the Court applies a two-step approach under Rule 12(b)(6).  <u>Harris v. Mills</u>, 572 F.3d 66, 72 (2d Cir. 2009); <u>see</u> <u>also</u> <u>L-7 Designs, Inc.</u>, 647 F.3d at 430 (applying same approach to motion under Fed. R. Civ. P. 12(c)).  After identifying the elements of the applicable causes of action, <u>Ashcroft v. Iqbal</u>, 556 U.S. at 675, the Court must first note the allegations not entitled to the "assumption of truth" because they are only legal conclusions.  <u>Id.</u> at 679-80; and, second, it must assess the factual allegations in context to determine whether they plausibly suggest an entitlement to relief.  <u>Id.</u> at 681.

### **Standard Under Rule 9(b)**

Under Fed. R. Civ. P. 9(b), incorporated by Fed. R. Bankr. P. 7009, when alleging fraud "a party must state with particularity the circumstances constituting fraud. . . .  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  While intent or knowledge may be averred generally, however, the plaintiff must plead the events claimed to give rise to an inference of intent or knowledge, <u>Devaney v. Chester</u>, 813 F.2d 566, 568 (2d Cir. 1987).

"Particularity" for purposes of Rule 9(b) means that the complaint must state the who, what, when, and where of the alleged misrepresentation (unless there is "some alternative means

of injecting precision and some measure of substantiation" into the complaint's allegations, 2
Moore's Federal Practice §9.03[b] (3rd Ed. 2012), at 9-17-18) and how it furthered the fraud. See
Acito v. IMCERA Grp., 47 F.3d 47, 51 (2d Cir. 1995); McLaughlin v. Anderson, 962 F.2d 187,
191 (2d Cir. 1991); Solow v. Stone, 994 F. Supp. 173, 182 (S.D.N.Y. 1998) (applying Rule 9(b)
to claims of fraudulent omission), aff'd, 163 F.3d 151 (2d Cir. 1998). Generally allegations of
fraud may not be made upon information and belief, unless the facts are peculiarly within the
opposing party's knowledge, in which case the allegations must state the facts upon which the
belief is based. Madison-Onodaga Corp. v. Kanaley (In re Kanaley), 241 B.R. 795, 803 (Bankr.
S.D.N.Y. 1999), In re O.P.M. Leasing Servs., Inc., 32 B.R. 199, 203-204 (Bankr. S.D.N.Y.
1983). Rule 9(b) is not satisfied by allegations that lump a defendant together with other
defendants in common activity, unless there is particularized support for the specific defendant's
role in the common activity. Securities Investor Protection Corp. v. Stratton Oakmont, Inc., 234
B.R. 293, 310 (Bankr. S.D.N.Y. 1999); 2 Moore's Federal Practice §9.03[1][f] at 9-26 ("If a
claim involves multiple defending parties, a claimant usually may not group all claimed
wrongdoers together in a single set of allegations. Rather, the claimant must make specific and
separate allegations for each defendant.").

In addition to providing fair notice, Rule 9(b) serves to protect defendants' reputation or
good will from unfounded allegations of fraud and reduce the number of strike suits. DiVittorio
v. Equidyne Extractive Indus., 822 F.2d 1242, 1247 (2d Cir. 1987); Silverman v. Actrade
Capital, Inc. (In re Actrade Fin. Techs. Ltd.), 337 B.R. 791, 801 (Bankr. S.D.N.Y. 2005).

## Discussion

The Plaintiffs have asserted three causes of action against Beckman: for aiding
and abetting fraud and fraudulent inducement, for aiding and abetting breach of fiduciary duty,

and for conversion (counts two, four and seven, respectively).[3]  The Complaint does not allege that Beckman itself committed fraud, fraudulent inducement or malpractice or breached a fiduciary duty that it owed any of the Plaintiffs, only that it aided and abetted others' fraud, fraudulent inducement or breach of fiduciary duty.

    1.  _Aiding and Abetting Claims_

In New York,[4] to establish a claim of aiding and abetting a tort, a plaintiff must allege (i) a tort by a primary wrongdoer, (ii) the aider and abettor's knowledge of the tort, and (iii) substantial assistance by the aider and abettor in carrying out the tort.  See Armstrong v. McAlpin, 699 F.2d 79, 91 (2d Cir. 1983); Krys v. Sugrue (In re Refco Inc. Sec. Litig.), 2012 U.S. Dist. LEXIS 108305 *16 (S.D.N.Y. July 28, 3012); Broad-Bussel Family LP v. Bayou Grp. LLC (In re Bayou Hedge Funds Inv. Litig.), 472 F. Supp. 2d 528, 532 (S.D.N.Y. 2007).  Here, the alleged tort is one or more of the four frauds (or related breaches of fiduciary duty based on such frauds)[5] described above allegedly committed on or against the Boyarsky Parties or Jeweled Objects by Defendants Hoberman, May, HGL, REI, or Esmerian.  Fed. R. Civ. P. 9(b)'s

---

[3] Counts two and four are phrased as claims for conspiracy to commit fraud and fraudulent inducement and conspiracy to commit breach of fiduciary duty; however, footnote two of Plaintiffs' Opposition to the Motion requests that such counts be treated as aiding and abetting claims, not conspiracy claims.  Because the wrongdoing underlying the alleged conspiracy is the same as the aiding and abetting claims, the Plaintiffs could not assert separate conspiracy claims in any event.  Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distribs.), 446 B.R. 32, 53 (Bankr. E.D.N.Y. 2011); Buchwald v. Renco Grp. (In re Magnesium Corp. of Am.), 399 B.R. 722, 774-76 (Bankr. S.D.N.Y. 2009); In re Stratton Oakmont, Inc., 234 B.R. at 332; Kew Gardens Hills Apt. Owners, Inc. v. Horing Welikson & Rosen, P.C., 35 A.D.3d 383, 386 (2d Dep't 2006).

[4] The parties agree, correctly, that New York law governs this aiding and abetting and conversion dispute, the Plaintiffs being New York residents or having their principal place of business in New York and the alleged torts having occurred in New York. See In re Magnesium Corp. of Am., 399 B.R. at 742-43 (applying New York interests analysis to tort claims, including claims for aiding and abetting a breach of fiduciary duty).

[5] Under New York law, the elements of aiding and abetting a breach of fiduciary duty are consistent with the foregoing:  (1) breach by a fiduciary of an obligation to another, (2) the defendant knowingly induced or participated in the breach, and (3) the plaintiff suffered damages.  Sharp Int'l Corp. v. State St. Bank & Trust Co., (In re Sharp Int'l Corp.) 403 F.3d 43, 49 (2d Cir. 2005); Silverman v. H.I.L. Assocs. (In re Allou Distribs., Inc.), 387 B.R. 365, 409 (Bankr. E.D.N.Y. 2008).

particularity requirement applies to the fraud elements of the aiding and abetting claims, whether they sound in fraud or breach of fiduciary duty. See Kolbeck v. LIT Am. 939 F. Supp. 240, 245 (S.D.N.Y. 1996), aff'd, 152 F.3d 918 (2d Cir. 1998); Henneberry v. Sumitomo Corp. of Am., 415 F. Supp. 2d 423, 464 (S.D.N.Y. 2006).

As should be evident from the facts set forth above, the Complaint fails entirely with respect to the second and third elements of its aiding and abetting claims, even if one assumes that the Complaint has sufficiently pled fraud, fraudulent inducement or a related breach of fiduciary duty by one or more of Hoberman, May, HGL, REI or Esmerian.[6]

*(a) Beckman's Lack of Knowledge*

As noted, a plaintiff must establish that the aider and abettor had knowledge of the alleged wrongdoing. Wight v. BankAmerica Corp., 219 F.3d 79, 91 (2d Cir. 2000) ("knowledge of the underlying wrong" is a "required element" of aiding and abetting claim under New York law). "Knowledge" for this purpose means either actual knowledge, see Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 652 F. Supp. 2d 495, 502 (S.D.N.Y. 2009), and JP Morgan Chase Bank v. Winnick, 406 F. Supp. 2d 247, 253 n.4 (S.D.N.Y. 2005) ("[T]he weight of the case law … defines knowledge in the context of an aiding and abetting claim as actual knowledge"), or, alternatively, "conscious avoidance," see In re Agape Litig. v. Cosmo, 773 F. Supp. 2d 298, 309 (E.D.N.Y. 2011), and Fraternity Fund v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007) ("no reason to spare a putative aider and abettor who consciously avoids confirming facts that, if known, would demonstrate the fraudulent nature of the endeavor"). But see Sharp Int'l Corp v. Stat St. Bank & Trust Co. (In re

---

[6] The assumption that the Complaint satisfies the first element of aiding and abetting is by no means a safe one, however, with respect to most of the fraud-based claims – the nature and circumstances of the alleged fraudulent statements or omissions, with the exception of REI's representations to Jeweled Objects in the JPA and Hoberman's representations to Boyarsky regarding the Jewels' value (although the date of these representations is not set forth), not having been pled with the particularity required by Rule 9(b).

Sharp Int'l Corp.), 403 F.3d 43, 49 (2d Cir. 2005) ("[A]lthough a plaintiff is not required to allege that the aider and abettor had an intent to harm, there must be an allegation that such defendant had actual knowledge of the breach of duty."). The distinction between actual knowledge and conscious avoidance3 is, at most miniscule, however: consciously avoiding something is tantamount to knowing it. See Krys v. Sugrue, 2012 U.S. Dist. LEXIS 108305 **16-18 (concluding that dispute over degree of required knowledge for purposes of aiding and abetting claim is a "narrow one" under New York Law and noting that under either approach "plaintiffs must allege that defendants had knowledge of fraud above and beyond alleging that defendants were 'on notice' to exercise reasonable care."). Constructive knowledge of the primary fraud, meaning "the possession of information which would cause a person exercising reasonable care and diligence to become aware of the fraud," does not suffice. Filler v. Hanvit Bank, 339 F. Supp. 2d 553, 557 (S.D.N.Y. 2004), aff'd, 156 Fed. Appx. 413 (2d Cir. 2005).

Actual knowledge for aiding and abetting purposes may be established by clear and convincing evidence of sufficient facts to support a strong inference of actual knowledge of the underlying wrong. JP Morgan Chase Bank v. Winnick, 406 F. Supp. 2d. at 253-55. It is not surprising, therefore, that "the burden of demonstrating actual knowledge, although not insurmountable, is nevertheless a heavy one." Chemtex, LLC v. St. Anthony Enters., 490 F. Supp. 2d 536, 549 (S.D.N.Y. 2007) (internal quotation marks omitted).

The Complaint does not even attempt to allege that Beckman had knowledge of the alleged frauds regarding the Jewels' appraised value, Esmerian's allegedly improper sale of one of the Jewels or Hoberman and May's alleged secret scheme not to enforce Jeweled Object's rights in the collateral.

The Complaint does at least assert that Beckman knew of the falsity of REI's representations in the JPA that it owned the Jewels free and clear and did not require any third party consent to sell them to Jeweled Objects. That allegation, however, is wholly conclusory. It has no support with the exception of the statement that Beckman represented both REI and Jeweled Objects in connection with the JPA. That role, however, is not enough to give rise to an inference that Beckman knew of REI's fraud. It is well settled under New York law that the mere fact that an attorney represented a wrongdoer in a tortious transaction does not justify then inference that the attorney knew of the wrong. In re Bayou Hedge Funds Inv. Litig., 472 F. Supp. 2d at 533 (citing to National Westminster Bank USA v. Weksel, 124 A.D.2d 144, 146-47 (1st Dep't 1987). See also Roni LLC v. Arfa, 72 A.D.3d 413, 414 (1st Dep't 2010) ("Simply put, the allegation that the Attorney Defendants structured the transactions at issue does not, without more, give rise to a reasonable inference that such professionals were aware" of the tort), aff'd, 15 N.Y.2d 826 (2010) ("conclusory pleadings do not give rise to inference that attorney defendants knowingly participated" in tortious scheme).[7]

It is not alleged, for example, that Beckman gave an opinion with respect to REI's transfer of or title in the Jewels or was asked to or in fact performed due diligence on REI's title

---

[7] Because of the wholly conclusory nature of the Complaint's allegation that Beckman knew of REI's misrepresentations in the JPA, there is no reason to decide whether, as Beckman contends, far more than knowledge of its client's wrongdoing must be shown to state a claim by a non-client against a lawyer for participating in tortious scheme in connection with which he or she served as counsel, or whether mere knowledge coupled with knowledge of third party's reliance would suffice. Compare Solovay v. Greater New York Savs. Bank, 198 A.D.2d 27, 28 (1st Dep't 1993) (attorney who counseled bank did not commit wrongful act, client did); Schatz v. Rosenberg, 943 F.2d 485 (4th Cir. 1991), cert. denied, 503 U.S. 936 (1992); In re Bayou Hedge Funds Inv. Litig., 472 F. Supp.2d at 533-34 (absent fiduciary duty, no liability for silence regarding fraud constituting breach of fiduciary duty) (citing In re Sharp Int'l Corp., 403 F.3d at 50), and Aranki v. Goldman & Assocs., LLP, 34 A.D3d 510 (2d Dep't 2006) (complaint's allegations of collusion "fall within the narrow exception of fraud, collusion, malicious acts or other special circumstances under which a cause of action alleging attorney malpractice may be asserted absent a showing of actual or near-privity"); Joel v. Weber, 197 A.D.2d 396 (1st Dep't 1993) (motion to dismiss denied where attorney "knowingly and recklessly encouraged, induced and assisted" client's conversion and concealed such conversion from non-client plaintiff); Newburger, Loeb & Co. v. Gross, 563 F.2d 1057, 1080 (2d Cir. 1977), cert. denied, 434 U.S. 1036 (1978) (attorney liable to non-client for inducing and participating in client's breach of fiduciary duty "maliciously, fraudulently, or knowingly"); Rubin v. Schottenstein, Zox & Dunn, 143 F.3d 263, 267-68 (6th Cir. 1998). See generally Restatement 3d, The Law Governing Lawyers §§ 94, 98 (2000).

18

in the Jewels during which it discovered that REI had pledged six of the Jewels to Merrill Lynch, nor are any other facts alleged that would lead to a strong inference that Beckman knew that any Jewels had already been pledged besides the fact that Beckman was the lawyer on the JPA and on at least one of the amendments to the Deferred Purchase Agreement.  More was required.  Cf. Nisselson v. Ford Motor Co. (In re Monahan Ford Corp.), 340 B.R. 1, 156-57 (Bankr. E.D.N.Y. 2006) ("actual knowledge" was adequately pled because complaint alleged defendant attended the meeting where the fraudulent scheme was hatched), app. denied, 2008 U.S. Dist. LEXIS 57826 (E.D.N.Y. July 18, 2008); Goldson v. Walker, 65 A.D.3d 1084 (2d Dep't 2009) (aiding and abetting fraud was adequately pled based on detailed allegations leading to inference that attorney had direct knowledge that property was being sold for less than fair market value, title report's obvious failure to include certain relevant conditions, and attorney having provided false information); JP Morgan Chase Bank v. Winnick, 406 F. Supp. 2d at 253-55 (aiding and abetting claim survives motion to dismiss based, in part, on email exchanges by, among and to the defendants detailing the transactions at the core of the fraudulent scheme and defendants' understanding of their wrongful nature).

### (b) Beckman's Lack of Substantial Assistance

The Complaint also fails to plead the third aiding and abetting requirement, of "substantial assistance" to the fraud or related breach of fiduciary duty.  Under New York law, a defendant substantially assists in the commission of a tort when it affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the tort to proceed.  See JP Morgan Chase Bank v. Winnick, 406 F. Supp. 2d at 256 (citing Nigerian Nat'l Petroleum Corp. v. Citibank, N.A., 1999 U.S. Dist. LEXIS 111599 (S.D.N.Y. July 30, 1999); see also Armstrong v. McAlpin, 699 F.2d at 91.

This aspect of the cause of action thus fails for the same reasons discussed above:  one cannot affirmatively, help conceal or fail to stop the commission of a tort that one knows nothing about.[8]

2. *Conversion Claim*

Conversion is the "unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." Vigilent Ins. Co. of Am. v. Housing Auth. of the City of El Paso, 87 N.Y.2d 36, 44 (1995).  To state a claim for conversion under New York law, one must allege facts sufficient to show (1) title to the property converted, or the right to possession of that property, (2) an act of conversion by the defendant, and (3) damages caused by the conversion.  Schatzki v. Weiser Capital Mgmt., LLC, 2012 U.S. Dist. LEXIS 6265 17 (S.D.N.Y. 2012).  Rather remarkably, the Complaint contends that Beckman is liable to the Plaintiffs for conversion because Beckman "failed to take any genuine steps to enable Jeweled Objects to seize the [a]dditional [c]ollateral from May and Esmerian" under Amendment #2 to the Deferred Purchase Agreement after the Esmerian parties' default. Complaint ¶ 160.

Clearly as to the Boyarsky Parties, the Complaint does not satisfy the first element of conversion:  the Boyarsky Parties had no direct interest in the additional collateral or the right to its possession.  They did not own it, and it was not pledged to them.

The Complaint also clearly does not satisfy the second element of the cause of action as to Jeweled Objects, assuming that Jeweled Objects' interest in the additional collateral is sufficient to satisfy the first element of a conversion claim, or the Boyarsky Parties.  The Complaint does not allege, except in the most conclusory way, that Beckman took any action to

---

[8] Moreover, "the mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff," In re Sharp Int'l Corp., 403 F.3d at 50, and, at least as to the Boyarsky Parties, Beckman owed no fiduciary duty.

convert the additional collateral.   Nor would such an allegation be plausible, because the

Complaint does not allege that Beckman had or exerted any control over the additional collateral

with the exception of acting as escrow/UCC agent, and there is no allegation that Beckman

wrongly refused to act on correct escrow instructions or that Beckman, even more implausibly,

owed a duty to Jeweled Objects to give itself such instructions or to act as Jeweled Objects'

behalf to levy on the collateral when it had not been hired to do so.

   *3.   Legal Malpractice Claim*

   As noted above, the Complaint does not assert any claim against Beckman other than for

aiding and abetting, with the exception of the conversion claim.   It does not, for example, assert

that Beckman itself breached a fiduciary duty to any of the Plaintiffs or is liable to any of them

for legal malpractice.   The Court nevertheless invited briefing on whether the facts of the

Complaint could be read to assert such a cause of action.   Having reviewed the parties'

submissions on this issue, it is clear that, as drafted, the Complaint does not set forth sufficient

facts to allege a claim for Beckman's own breach of fiduciary duty or malpractice, see Carney v.

Philippone, 332 F.3d 163, 167 (2d Cir. 2003) (citing to Campcore, Inc. v. Mathews, 261 A.D.2d

870 (4th Dep't 1999), app. den., 93 N.Y.2d 814 (1999)), even before considering Beckman's

statute of limitations defense under NY C.P.L.R. § 214(6).

## Conclusion

   For the foregoing reasons, Beckman's Motion is granted in its entirety, without prejudice

to Plaintiffs' right to file a motion under Fed. R. Bankr. P. 7015 for leave to amend the

Complaint.   Such motion must attach the proposed amended complaint and be filed and served

on or before September 21, 2012.   If such a motion is not filed, the Court will enter an order

dismissing the Complaint with prejudice.  Beckman shall submit a proposed order to chambers

consistent with the foregoing.

Dated:  White Plains, New York
        August 22, 2012


                                            /s/Robert D. Drain
                                            United States Bankruptcy Judge